5-14-1078 United States v. Multiple Dependents Ms. O'Brien Good morning, your honors. May it please the court, Leslie O'Brien for Mr. Liriano. The central issue in the case before the court was whether the government was able to prove that the defendants had the state of mind that was necessary to prove that they were members of the conspiracy to transport drugs into Puerto Rico. So the question raised was whether there was an agreement, whether these particular defendants agreed to participate and had the purpose of transporting those drugs to Puerto Rico. Would you agree with me that circumstantial evidence can establish an agreement? I would, yes. And state of mind required for an agreement? I do agree that that's possible. In this case, I can't concede that there was such evidence. And the main point that I'm arguing refers to the first argument in the briefs. And that is that there was improper expert testimony on this issue. That a DEA agent was permitted to testify before the court, before the jurors, that these defendants, that the purpose of these defendants was to be part of that conspiracy. And I want to be absolutely Well, let's leave aside that. What about the fact that they were in a 25 to 30 foot boat, open boat, in which, I forget how many kilos, but a substantial number of kilos of drugs were found in open view? Your Honor, I have to say I came prepared to argue the matter of the expert Oh, well, I'll withdraw my question for somebody else. But it seems to me that you started by saying that you doubted whether the government had established that they had joined a conspiracy. Well, this was the question, of course, in the case. And an important question here is whether the expert testimony was improperly admitted. And there's a particular statement, and I want to be There were a couple of different statements by the expert. But one in particular that was objected to was the expert statement, the people that are on those boats are there for one purpose, and that's to get the drugs where they're going. That statement was objectionable under Rule 704. Was there a contemporaneous objection to the question that prompted that statement? There was a contemporaneous objection, although the objection at that point concerned repetitiveness because the There was no meaningful objection to the question. There was no motion to strike the answer when it was given? Your Honor, it had to be, that's true, but it had to be absolutely 100 percent clear to the court the nature of the objection because there was a motion by the defendant to exclude this type of evidence. There was argument before the court that the expert should not be permitted to testify to matters that were within the purview of the jurors. But even if the expert wasn't, the court, Judge Garcia was very careful to limit the expert to three categories of testimony. Yes, and this exceeded those categories. Well, if it did, there should have either been an objection to the question on the appropriate ground, or a motion to strike the answer, or a request for a cautionary instruction. None of those occurred. I'm not saying that that would not have been preferable, Your Honor, but of course we know that the purpose of an objection is to make it clear to the court what the grounds are for the objection, and there had been such extensive argument regarding this precise issue before the expert made this statement that it had to be clear to the court. Counsel, when you object on the ground of repetitiveness, the judge asks himself only one question. Does this question go over matter that's already been testified to by this witness? He doesn't have to say, he doesn't have to re-examine any of his prior rulings. That's the reason we require objections, to focus the court on what you think is wrong with the question. Well, the repetitiveness, Your Honor, concerned the same type of response by the expert. Even if you look at this under the plain error standard, Your Honor, it's plain error. The answer of the expert was in clear violation of Rule 704, so allowing it was plain error. Because this was the central issue. Isn't there an ambiguity in the testimony in the sense of whether he's saying these defendants did this, or whether he's saying that in general, when boats like this are transporting drugs, this is the situation? No, Your Honor, there's not a speck of ambiguity when he's saying the people that are on those boats are there for one purpose, and that's to get the drugs where they're going. There's not a speck of ambiguity in that response. How many boats were involved in this operation? There was one homemade EULA involved in this operation. So when he says these boats, that can't be a reference to this operation. That's got to be a much more general reference. Well, Your Honor, I'd suggest that that's really read in context. It's absolutely 100% clear that the prosecution was bound and determined to get this expert testimony into evidence. The prosecutor repeatedly argued that the expert should be permitted to testify that these men were not on that boat by happenstance. That was the argument that was... The judge never permitted the expert to testify to that. But Your Honor, the fact is that the expert did testify to it, and the judge was very much aware of the reason for the objection. I'm sorry, I have to go back to my question again, because assuming that this is... It was an appropriate line of questioning. Isn't there an overwhelming amount of evidence that acknowledges that these people were on board this boat with all these drugs? And it's a small boat, it's open, and there were pictures or somebody saw them throw the drugs overboard. Well, it's not true that somebody saw these particular defendants throw the drugs overboard. There was testimony to the effect that operating this... The boat was full of drugs, it was open to the sight, and these people were on board. And they came from a long voyage across the ocean. And that's not enough to establish that... You think that's mere presence? That's exactly the defense in this case, that there was mere presence, that there was mere presence. But our cases make a distinction between mere presence and culpable presence. And the facts that Judge Sorolla has outlined seems to me give rise to an inference. Jury doesn't have to take it, but give rise to an inference of culpable presence. But certainly not a necessary inference, Your Honor. It may not be necessary, that's why we have juries. That's exactly why we have juries, and it's also why experts are not to be permitted to testify in the manner that this expert did. Thank you, Your Honors. Thank you. Ms. Sweeney, good morning. I'm representing Mr. Vincente Arias. And I've chosen to address the question that the court has asked Ms. O'Brien. And that is, or the topic, and that is whether the government's case was overwhelming or even strong or even sufficient. So I will address that subject. I do want to say that I, obviously we've divided this up, you know, given our time. But it doesn't mean I waive other arguments. Other counsel behind me will be arguing on the closing argument aspect of it, which I also raised. On this business of these votes, I do want to, as the expert called it, I do want to point out that in this case, there's a, going through the cases on these votes that have been, many of them are going into Puerto Rico, some are YOLOs, some are not. And, you know, there has been a list that's been developed in different cases. And when you go through the list, one of the, one case that actually was the Guerrero case that kind of, kind of listed them as it was then, it talked about the closeness of the cruise relationship, the length of the voyage, the size and condition of the vessel, the quantity of marijuana or contraband, and whether the absence of a legitimate purpose for the voyage. I'd like to start out with the absence of a legitimate purpose for the voyage. There was a legitimate purpose for the voyage. Now, to this court or the law, it was not strictly legitimate, but it was an alternative purpose. And in fact, the government agreed that there was that purpose. And that is that some of these defendants, at least some of them, they were all from the Dominican Republic. And they were, my client, at least, and others were, said that they wanted to, they were smuggling themselves into Puerto Rico. Yeah, but I don't think the testimony that you rely on from the government really says that. I read it. And it does not say that it's common on these drug boats to also be smuggling illegal aliens. Your Honor, I'm sorry, but I can't hear you. There's something about the acoustics in this room. I say you rely on testimony, as I understand it, that it's common to smuggle illegal aliens on drug boats. I don't read the testimony as saying that. And the cases seem to suggest that that's not done, that it is common knowledge that you wouldn't have somebody on a drug boat who wasn't involved in drug operation. Could you address that? Because I don't, the testimony that you rely on, I don't see as saying that you have a dual purpose here of smuggling drugs and smuggling illegal aliens. I will address it, Your Honor. But if I may just finish this point, is that there, this was so undisputed that the government went to charge and convict several of these defendants for illegal entering the United States. In many of the cases... That doesn't show that they were being smuggled for that purpose. It just shows that they were illegally entering the United States. Your whole point depends on showing that these boats can have a dual purpose of smuggling people and smuggling drugs. I understand, Your Honor. I fully expected the court to say, well, you mean if they had an additional criminal purpose, that made it okay? No, I'm not arguing that. I'm just pointing out that many of the cases say there was no fishing equipment, there was no, you know, any of that stuff. True, but I'm just pointing out that this is just one factor that I think should be noted. That's all. Well, the jury, you know, I assume that was argued before the jury in the district court. That they were not really smuggling drugs, that they were there just to get into Puerto Rico. Well, that was presented to the jury. Believe it or not. The reason I'm raising this is I'm only raising the part of this, Attorney O'Brien argued the impermissible expert testimony part of it. I'm only addressing the prejudice aspect as it goes to many subjects. That's all. I understand that, that it is the jury's, including the subject of whether there should have been an order of acquittal. But, so I'm just saying that the second prong of this is, now on the, I want to go back to that point about the, was it the size and condition of the vessel was that point. Was it, yes, it was a Yola. A Yola, by the way, where there was testimony that these boats were very often used to import people who wanted to get into Puerto Rico unlawfully. So I just make that point again. But yes, that was true. But this is one factor, and it doesn't go to show that the defendant here was voluntarily participating. Now, the laws that say that the cases that note that, well, given the, some of them say given the value of the contraband, that drug smugglers would not entrust, they say, I don't know, bystanders, innocent bystanders, something like that, or with being on a boat, or what they say with handling these drugs. First of all, there's no evidence that my client handled the drugs at all. In fact, many of the cases talk about the crew. There was no evidence that all of these people were crew. Now, there was, if you look at the different cases, and I think there's a case called Piedrahita that talks about the size of the boat and the amount of crew, and if I'm thinking of the right case, and that talks about how the crew was so large. It must have meant that they were carrying drugs, because it was a 41-foot boat, and it would only need a crew of two or three, and here was a crew of, I don't know how many, but more than six. And so that showed they were smuggling drugs. Well, I mean, it seems like no matter what, what the size of the boat, what size of the crew. And finally, I guess I would like to say that this list of factors, or a list or mentioning of factors that has been drawn up in all these cases, I would ask the court to look critically at it. Yes, some of these things do make sense, but some of them, I mean, when you say, well, is more crew indicative that everyone on the boat knew, or is it less crew indicative of that? I mean, I actually traced back to see where this started, and I couldn't find it, whether it was testimony in some long-ago case. You know how factual testimony turns into a statement of law, and then all of a sudden it's a legal principle? You're going to have to go as far as to find a case in which people on an open boat that's 30-foot long are not participants. I don't think you're going to find one. But they have to be willing to participate. Well, thank you, Your Honor. Mr. LaCosta-Sanchez. Good morning, Your Honors. I represent Jose Pena-Santos. Your Honor, under this court's cumulative error doctrine, Mr. Pena-Santos is entitled to a new trial. And what I would like to start by pointing out, this was an entirely circumstantial case. There were no cooperating defendants. There was a video, but the video never identified Mr. Pena-Santos as throwing bales or being involved with narcotics. And what I would like to do is point out what we submitted are the five prejudicial errors, and then I will go through them. The first error is the misstatement in opening by the prosecutor. The second error is the agent's improper opinion testimony. The third error is what I would call the agent's misconduct in cross-examination. The fourth error is the improper redirect exam of the chemist by the prosecutor. And finally, the fifth error is the misstatement by the prosecutor on closing. And, Your Honors, you may not find that all of these individual errors are prejudicial, but in the aggregate, we submit that they were devastating to Mr. Pena's right to a fair trial. And I want to start with the misstatement on opening. Essentially, the prosecutor told the jurors that the court had determined that Mr. Pena-Santos was guilty. These are her words. It's already been determined by this court that the United States had jurisdiction over this vessel and that these individuals were on board this vessel, which we had jurisdiction over, with the intent and knowledge to possess and distribute narcotics. There was an objection by Mr. Pena. He stated that that was an issue of fact for the jury. And I think the context here is important as to why that misstatement was so devastating. The instructions were given to the jury the day before by a magistrate judge. This is really the first day of trial, and the defendants chose not to present an opening. So here's the U.S. government telling the jurors, which, as this experienced court knows, when they're in that box in the first day of trial, they're like a sponge absorbing information. But there's an objection, and the court tells the prosecutor to rephrase what she said. And she makes an effort to do it and does it the second time in a way that elicits no objection. And then the judge, at the end of the case, makes perfectly clear that intent is an issue for the jury. Actually, Your Honor, there was an objection, but in this particular instance where there was that misstatement, the judge did not rule on the objection, and the judge did not, for example, issue a curative instruction. Was he asked to? Yeah. Mr. Pena stood up and said, Objection, Your Honor. That's an issue. Was the judge asked to issue a curative instruction? He wasn't asked to issue a curative instruction, but he never ruled on the objection. But the prosecutor said that's not what I said, right? That's what she said, yes. But we submit that when you have a prosecutor telling the jurors that the court has determined that Mr. Pena is guilty, the court has to intervene, and the court did nothing. I haven't checked the instructions, but did the court give an instruction at the end of the trial that the argument of counsel and the statements of counsel are not evidence? It did give such an instruction, but as I'm going to argue, Your Honor, the errors just kept coming, and even a closing that was a misstatement by the prosecutor. The second error, which was presented by my colleague, is what we submit as the improper opinion testimony of this agent. And, Your Honors, I want to point out that what he did, he told the jurors. I mean, this went to an element of the offense, knowledge and intent. And what the government is doing in this entirely circumstantial case, they're putting on an expert to tell the jurors, as he told them, that Mr. Pena was there for one purpose, and each one of the defendants had a specific duty. And I submit, Your Honor, that that is addressing the ultimate issue before the jury, and it's improper testimony. And that impermissible opinion, Your Honor, is not harmless because it became the, as I argue in my brief, the centerpiece of the closing argument for the prosecution. Moving on to the third error, it's what I call the misconduct of the agent. The agent was being asked legitimately in cross-examination whether any assets by one of the defendants or valuables were found on any of the defendants. And he answers, to answer your question, obviously people that transport drugs such are your clients. True, there was no objection, but that just shows the misbehavior of this agent at trial. And he continued on. At page 150 of the appendix, everyone has a job, they're just not sitting there. Again, Your Honors, he's addressing the ultimate issue before the jury. So even if there was no objection, we submit that on the cumulative error doctrine, there should be a reversal here. The fourth error is the improper redirect exam by the prosecution. And I want to point out that this was a very short trial. The trial started with the jury instructions, then there were two days of testimony, then they took two days off, and there was a third day. So it was really a three-day trial where all these errors are taking place. And this court has recognized that in a short trial, this many errors can have a stronger punch than in a larger trial. Coming back to the redirect exam, the prosecutor, there was some evidence that there was a video, but the video did not identify any of the defendants throwing bales. It certainly did not identify Mr. Pena as throwing bales. Yet the prosecutor gets up in a redirect exam of the chemist in the case, and she asks, did you watch the video of the defendants throwing the drugs into the water? Now, there was no objection. Actually, there was an objection. She answered no anyway. So where's the prejudice? She answered no. She answered no, but that's an impermissible speaking question, Your Honor, because it's misstating the evidence for the jury. And there was an objection, and the judge allowed the question. But still, he answered no, or she. And finally, I do want to address the misstatements in closing. This prosecutor told the jurors that, and I'm quoting, that's not someone's personal drug stash right there. $3.2 million is not something that the four of them are going to use casually at parties. Those are drugs that four of them are going to sell at a profit. $3.2 million. Thank you. That was her closing. And that was highly improper. Why? Because there was no evidence in the entirely circumstantial case that Mr. Pena was involved in sales or that he was going to profit among the defendants at the tune of $3.2 million.  True, there was no objection, but there was no intervention by the judge. So, Your Honors, we submit that on the basis of all of these errors, the defendant is entitled to a third trial because he didn't get one. Thank you. Thank you. Mr. Morales, good morning. Good morning, Your Honors. Ken Seeger, I represent Jonathan Gil Martinez. Oh, Ken Seeger, I'm sorry. That's fine, Your Honor. Your Honors, I would like to discuss one issue that the other co-appellants have not raised, and that concern is the sentencing. And in this trial, Mr. Gil Martinez received a much higher sentence than one of the co-defendants, Vicente Arias. That's true, but there were distinguishing characteristics, were there not? Well, I would submit, Your Honor, that there were not. Was Arias found to be a minor participant? Well, that's correct, Your Honor. All right. And you haven't assigned error to the lack of any similar finding in your client's case. So the guideline sentencing range for your client was significantly higher than for Arias, and Judge Garcia sentenced your client to a downward variant sentence well below the bottom of the guideline range. And I think I'm fairly familiar, counsel, with our sentencing jurisprudence. And you correct me if I'm wrong, but I don't recall any time since the guidelines came into effect in 1987 that this Court has held that a sentence of below the bottom of the guideline range was substantively unreasonable. Well, I think what you're saying is correct, Your Honor, and I would just like to point out that this Court has also stated that a disparate sentence among co-defendants who are identically situated. Yes. That's why it's important that the guideline ranges were different. That distinguished the two defendants. Well, I would just submit, Your Honor, that I've looked at the trial record very closely, and there are a few factors which I think the Court should take into consideration. One is that both defendants are in the same criminal history category of one. Also, I don't see any difference in conduct among these defendants. But wasn't there evidence with respect to Mr. Gil Martinez that he operated the boat and refueled it? There was no evidence to that effect. Because the prosecutor says that at the sentencing. The prosecutor says that at sentencing, but that's another problem I have with this record. Where does that come from? Was that reported when the prosecutor said it? At sentencing? Yes. I thought that came from the pre-sentence report. I looked at the pre-sentence report very carefully, Your Honor, and I request that the panel does the same. I don't see any difference in conduct or any information that this particular defendant was operating the boat with a GPS device or switching fuel lines. The trial record reveals no difference in their conduct. So if the government is saying, telling the judge that there's information that Gil Martinez was doing something else, I don't see where that's supported by the record. Was that objected to? I'm sorry, Your Honor? Was there an objection to that evidence or that statement? The objection at sentencing was that Jonathan Gil Martinez should be treated the same as Vicente and that their conduct was the same. Was there any objection to this information that he had helped with the fueling, et cetera? I don't believe there was. Well, so how was the judge going to handle that? Your Honor, I mean, all I can say is that this information that In fact, how are we going to handle that? I mean, what basis do we have to go into something that hasn't been objected to? Your Honor, I simply don't see it in the record where it's supported in the record or any citations where that information is correct. But at sentencing, the hearsay rules don't apply, and you don't have to have the same evidentiary predicate that you do at a trial. So when a prosecutor as an officer of the court makes a statement of facts and it's not rebutted, defense counsel doesn't say, oh, those facts aren't true or that's not the case here, but simply accedes to that statement, how can the district court be criticized for accepting it? I'm not certain, Your Honors. The result, I would suggest, though, the result is a widely disparate sentence, and I just ask the court to look at that very carefully. Are there any other questions? Thank you. Thank you. Ms. Monroe, good morning. Good morning. May it please the Court, my name is Tiffany Monroe, and I represent the United States. Were you the trial attorney? No, I was not. Kelly Tiffany, Special Assistant U.S. Attorney Kelly Tiffany from the Coast Guard, was the trial attorney in this matter. Can I ask you to start where we just ended? What is the state of the record when we look at it concerning the role of Gil Martinez in piloting or refueling the boat? The prosecutor during the sentencing hearing informed the district court that during the course of debriefings with Gil Martinez, he admitted that he fueled and operated the vessel. In addition... That's in the record? Yes, that's on page six of the sentencing hearing transfer dated January 25, 2013. In addition, the prosecutor... Can you repeat that for me again? Absolutely. On page six of the sentencing hearing transfer dated January 25, 2013. What? 2013. At the same time, immediately thereafter, the prosecutor informed the district court that Pena also informed the government during a debriefing session that Gil Martinez refueled and operated the vessel. So that coupled with the fact that Gil Martinez did not have a minor participant reduction, the court determined that the appropriate guideline sentence was 235 months to 297 months. The court did take into account his personal circumstances and applied a downward variance. And as the court stated, a sentence below the guideline range is normally not considered unreasonable under these circumstances. I believe the appellant's argument goes to whether or not his sentence is fair in light of Vincente Arias' sentence. But the court at the sentencing hearing asked Gil's attorney to consider the fact that there was another defendant, who pleaded, who entered a straight plea, and his sentence was 188 months. And in light of that sentence, the court could not go below 188 months and impose a 120-month sentence, which Gil advocated for at the sentencing hearing. The court wanted to apprise Gil of that circumstance so that he could be aware of why the sentence could not be as low as Gil anticipated, because that would create a disparity given the fact that Almont pleaded, he entered a straight plea while Gil went to trial. And that was one of the factors that the court considered. One of the other issues that was raised by the appellants is whether or not the court erred in allowing the testimony of Agent Coach June. And in this particular case, the issue that the ---- that's probably not totally proper, but I am concerned. We keep having this kind of testimony in different circumstances, and we keep usually criticizing it, and the District of Puerto Rico keeps using this kind of testimony. I don't know what's going to be the outcome in this case, given the rest of the record, but it seems that you're putting your cases at risk to me. We're putting the cases at risk by By allowing this kind of testimony. The prosecutor's statements regarding what happened during debriefing? No, no, I'm talking about the agent testifying. Okay. The agent's testimony was well within the scope of the limitations applied by the district court. He had to testify to the price, the packaging, and the mode of transportation. And this court has held in Flores de Jesus that an expert may testify to a criminal scheme, and that also applies to a drug trafficking organization. And in this case, the question that was posed by the prosecutor, I would submit, does not require the expert to specifically identify the roles of each defendant in this case. The question posed was, in your experience, in the cases you've worked, have individuals not connected with trafficking of narcotics been involved with transportation? That did not require this particular agent to say whether or not Pena, Liriano, Vincente, or any of the other appellants played a specific role. And his response was very general. The people that are on those boats, and the boats that I believe he was referring to was the boats that are used for trafficking, get the drugs where they're going. They're there for protection. They switch out hoses, they act as mechanics or captains. Everyone has a role. Now, I would like to draw this court's attention to the cross-examination by Pena. Pena specifically asked this agent, what were the roles of each of the defendants in this case? That's what they suggest the prosecutor was attempting to do. In response, Agent Conscience stated that I don't know what their roles were, because he did not have personal knowledge. And the kind of, if he would have said yes and attempted to specifically identify the roles of each defendant, it would have been improper, because it would have been improper overview testimony. In this case, the appellant cited Casas and Flores de Jesus. In those cases, the experts, at least Flores was declared an expert and he provided late testimony, but he offered testimony as to the roles of the individual defendants that was not based on personal knowledge. While this court found it to be harmless, they did find error. It was harmless because of the weight of the evidence available. In Casas, the agent was not determined to be an expert and his testimony was improper, because he relied on the non-testifying co-conspirator. We don't have that in this case. We do not have Agent Conscience relying on reports, non-testifying co-conspirators. We don't have the type of problems that were identified by the appellants in those cases. This case is very different in that respect, and I would submit that Agent Conscience's testimony was proper, because we can distinguish it from those two cases in that way. Pena also cites the fact that Agent Cochin responded during cross-examination to a question posed by Liriani's attorney. Liriani's attorney asked him about the assets that his client may have been linked to during the course of a background check, because a DA often tries to see what assets are associated with people related to drug activity. In this case, the government objected and stated that it was outside of the scope of direct and that it was irrelevant. Over the government's objection, the court allowed the testimony, and that's when the statement of the agent came out. That was not testimony that the government attempted to elicit. We objected. At that point, I don't know how he should be, Pena should be entitled to a new trial based upon a question elicited by a co-defendant that was objected to by the government. Furthermore, that argument was waived because it was not raised at trial by Pena. I would like to address the issue of sufficiency of the evidence. In this case, we have a small YOLA that was painted in dark colors, and we know from the testimony of Agent Cochin and Luke Bregejes that oftentimes with YOLAs that are trying to evade detection, they paint the interior or the YOLA in the dark color blue so that it blends in with the water, so it allows them to not be detected by law enforcement. We also know that upon detection, the crew members on the vessel began to throw the bundles or the duffel bags overboard. And we also know from the testimony of Agent Cochin that the bags contained possibly 25 kilos of contraband, and Andrew Rusk from the Coast Guard as well as Luke Bregejes stated that it required at least two persons to remove these duffel bags from the suspect vessel onto the Coast Guard vessel. And I would submit that in light of the close quarters on the vessel and the quantity of drugs, in this case we know that the quantity of drugs was well over $3 million, that this court has held that that quantity, such a large quantity of drugs, permits the jury to infer that the appellants had the intent to distribute the contraband, in this case heroin and marijuana. In addition, you have in the record, Luke Bregejes from the Coast Guard identified all four appellants in open court as persons that were aboard the YOLA. While this evidence is certainly all circumstantial, it is sufficient to sustain a conviction in this matter. And I would submit in addition that the vessel contained multiple motors and several fuel tanks, which was quite unusual for the type of vessel that it is. And Coast Guard officer Luke Bregejes stated that they were not on the ship for a lawful purpose, such as fishing, as the court stated, and I would submit to the court that their conviction for conspiracy to possess with intent to distribute should be affirmed. I would like to address the matter of prosecutorial misconduct. In this case, the appellants cite to the opening statements of the prosecutor, where she begins to state the standard under the Maritime Drug Law Enforcement Act, which states that the judge will determine whether or not the vessel was within the jurisdiction of the United States. And that was a settled matter, and the court did explain that to the jury. The second statement in the paragraph identified by Pena's appellate counsel is something that, you know, could have been stated differently, but once it was objected to, and the objection raised by Pena clearly stated that the government had a burden to handle, immediately thereafter, after the objection, the prosecutor attempted to clarify the record that that was not what she intended to state, and that the jury was required to consider the intent of the appellant. We also can look to the opening statement, I mean the opening instructions by the court, which included an instruction that the statements of the, the arguments of the attorneys are not evidence, and that the jury would look to documentary and testimonial evidence to determine the guilt or innocence of the parties. We also can see in the final instructions to the jury that the jury was required to consider whether or not the appellants agreed to possess the contraband, the cocaine and heroin, and whether they had the specific intent to possess with intent to distribute. So given the instructions that were given to the jury, we would submit that the error identified by the jury was that the appellant does not rise to the level of requiring a new trial because it was remedied by the instructions given by the court. The other error that was identified, as this court pointed out, when the chemist was asked about watching the video, she stated that she did not, and the prosecutor was attempting to respond to a line of questioning made by Gil Martinez's attorney, where he asked the chemist several times whether or not she had submitted the cocaine for fingerprint testing. He was trying to create an inference that the appellants did not touch the drugs because there was videotape or testimony that showed that there was a point during the interception of the vessel where the contraband was thrown overboard. And while it could have been stated different, I would submit that there was no prejudice in that instance. And the final assignment of error regarding closing, the closing argument of the prosecutor that not, that's not someone's personal stash right here. 3.2 million is not something that the four of them are going to use casually at parties. Those are the drugs and the four of them are going to sell it at a profit. I would submit that it was a permissible inference based on this court's ruling in Meadows that the prosecutor can draw the jury's attention to circumstantial evidence which would demonstrate motive. The quantity of drugs in this case was quite significant, and in light of this court's ruling in Comier and Lathan, such a quantity of drugs can permit the inference of drug trafficking in this case. Unless the panel has any further questions, I will rest on my brief. I have one minor question. Were there six people on the vote originally? Yes, there were. Originally there were two other persons in addition to the appellants before you. There was Almont, I believe Alejandro Almont, no, I can't pronounce the first name, Bustafiano Almont, and Alejandro Defat. Alejandro Defat, he originally pleaded, he entered a straight plea and then he withdrew it. And then he entered a guilty plea, count one was dismissed, count two he was sentenced to 48 months. The other defendant, Almont, entered a straight plea and was sentenced to 188 months. Okay, but my question is this, in looking at the video, I know you can't identify the individual defendants, can you tell from the video that there are six people throwing veils overboard? Yes, you have the testimony of Ryan Perry from the border, Customs and Border Patrol, which indicated that there were several persons, up to six persons on board the vessel. Yes, and those six people include the appellants in Almont as well as Defo. In this case, the government. You can tell that six people were throwing veils overboard, that sort of suggests that six people were involved in the drug conspiracy. Yes, well, the evidence submitted that at least two people were required to throw the veils overboard and that they were observed moving and they were slow to respond to the Coast Guard's orders to remain calm. Yes, and they were not detained still, which would also suggest that they were involved in criminal activity on board the vessel. I still am not sure of the answer to the question. If you look at the video, will you see that all six people on board were engaged in throwing veils overboard? I cannot say that from the record, Your Honor, I cannot say that. Is that video in the record? Yes, it was submitted, I believe it was government's exhibit 5-1 through 5-4. If that was not the proper citation, I can update the court and supplement to the record. If there are no further questions, the government rests on its brief.